# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| QEP FIELD SERVICES COMPANY, a Utah Corporation,<br><br>Plaintiff,<br><br>v.<br><br>UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, a federal corporation chartered under 25 U.S.C. 476,<br><br>Defendant. | **ORDER<br>AND<br>MEMORANDUM DECISION**<br><br>Case No. 2:10-cv-00700-TC<br><br>Judge Tena Campbell |

QEP Field Services Company seeks to enjoin the Ute Indian Tribe of the Uintah and Ouray Reservation (the "Tribe") from limiting access to QEP's Stagecoach Processing Plant, the Iron Horse Turnaround expansion project, and related construction activities. This court has subject matter jurisdiction and determines that because the Tribal Court entered its preliminary injunction against QEP without jurisdiction, that preliminary injunction is not valid. The court further finds that QEP has established the four factors necessary to obtain a preliminary injunction. Therefore, the court GRANTS QEP's motion for a preliminary injunction.

**BACKGROUND**[1]

### THE SURFACE USE AND ACCESS CONCESSION AGREEMENT

In January of 2005, the Tribe and QEP entered into a Surface Use and Access

---

[1] Because Judge Dale Kimball considered many of the same materials presented to the court in this motion for preliminary injunction in his Memorandum Decision and Order Granting Preliminary Injunction, the court draws heavily from that order. See Mem. Dec. and Order Granting Preliminary Injunction, 8-9, attached as Ex. M to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.

Concession Agreement ("the Agreement"). The Agreement comprehensively sets forth QEP's rights of access to certain lands owned by the Tribe. Article 2 of the Agreement provides that the Agreement "constitutes a complete grant of access by the Tribe to [QEP], its employees, representatives and contractors for the purposes outlined herein." (Agreement ¶ 2.1, attached as Ex. A to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) As more specifically outlined in other provisions, the Tribe agreed to grant QEP the "right to access and use so much of Concession Area 1, the Existing Pipeline Corridors, and the Existing Distribution Corridors as is reasonably necessary for the existing and <u>future</u> Transportation Pipelines, Distribution Facilities, and Oil and Gas Activities of [QEP]."[2] (<u>Id.</u> (emphasis added).)

Article 4 of the Agreement addresses future oil and gas activities. (<u>Id.</u> ¶¶ 4.1 to 4.5.) Article 4 gives QEP the right to conduct future activities such as, "the construction of new gathering lines and any new compression, blending, treatment and processing facilities and equipment." (<u>Id.</u> ¶ 4.1.) In connection with such future work, QEP is required to submit right-of-way applications and necessary applications and forms. (<u>Id.</u> ¶¶ 4.2, 4.3.) The Tribe is required to "provide prompt written notice to [QEP] of its reasons for denying or delaying access" and QEP can challenge the Tribe's refusal in arbitration. (<u>Id.</u> ¶ 4.3.) Article 4 specifically references the dispute resolution provisions contained in Article 17 of the

---

[2] The surface access allowed under Article 2 includes the following specified activities: "the construction, drilling, completing, operation, maintenance, repair, replacement, looping (adding additional pipelines in same right-of-way), expansion (increasing size of the pipeline in the same right-of-way), extension (new pipeline joined to existing pipeline limited to exclusively to Concession Area 1 and the Existing Pipeline and Distribution Corridors), modification, reconstruction, restoration, rehabilitation of well-sites, gathering systems, mainline systems, distribution systems, measurement facilities, compressor stations, processing facilities, taps, dehydration facilities, valve assemblies, storage and injection facilities and other associated appurtenances and facilities."

Agreement. (Id.)

Article 10 of the Agreement addresses applications for surface access. Article 10 states that "[a]s to any proposed new surface uses, [QEP] will file appropriate right-of-way applications with the Tribe and the BIA and provide the notice required under Article 11. Upon expiration of the notice period, [QEP] may use and access the surface applied for unless notified in writing by the Tribe of an objection to the proposed use based on reasons of the health and safety of the Tribe, and those who use and inhabit tribal lands." (Id. ¶ 10.4.)

Article 17 of the Agreement applies to resolution of disputes arising out of or relating to the Agreement. Under Article 17, a party claiming that another party is in breach of the Agreement must provide the other party with written notice of the alleged breach. (Id. ¶ 17.1.) No breach is subject to a claim until thirty days have passed from the date of the written notice of the alleged breach. (Id.)

If any dispute or claim is not settled within the thirty-day period, either party may seek a resolution of the dispute by arbitration. (Id. ¶ 17.2.) Under these dispute resolution procedures, the Tribe "expressly grants a limited waiver of Tribal sovereign immunity for the limited purpose of adjudicating any and all claims, disputes or causes of action arising out of or relating to this Concession Agreement and consents to arbitration and suit solely for such limited purposes." (Id.) Because the tribe made only a limited waiver of sovereign immunity, QEP may not recover money damages and may only seek only injunctive and declaratory relief. (Id.)

The parties further agree under Article 17 that "they shall have as a first recourse for the enforcement of this Article 17 to the United States District Court for the District of Utah and appellate courts therefrom." (Id. ¶ 17.5.) "The tribe makes its limited waiver of sovereign

3

immunity for purposes of any action by [QEP] to enforce this Concession Agreement, and agrees to forego any right or claim or right to seek or require exhaustion of Tribal court remedies as a prerequisite to any action by [QEP] to enforce this Concession Agreement." (Id.) The Tribe also agreed under another provision that "[s]hould any conflict arise between Tribal laws and regulations and this Concession Agreement, Tribal laws and regulations shall not control over the specific provisions of this Concession Agreement." (Id. Art. 14.)

### THE EXCLUSION OF QEP FROM THE PLANT AND THE CONSTRUCTION SITE

The Stagecoach Processing Plant is a natural gas processing facility constructed in 2007. and located on a 13.42 acre fenced parcel (the "Stagecoach Parcel") on the Uintah-Ouray Reservation. (Legal Description, attached as Ex. D to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) QEP maintains that it constructed the plant pursuant to the requirements of the Agreement. For over three years the facility operated without interruption from the Tribe. QEP expanded the processing plant in 2009, and in early 2010 began constructing the Iron Horse Turnaround, a facility located on Stagecoach Parcel. For these expansion projects, QEP submitted information about the project to the Tribe as contemplated in the Agreement and received no notice of objection by the Tribe. Work on the Iron Horse Turnaround began March 1, 2010, and continued until the Tribe excluded contractors from the 13.42 acre parcel on June 22, 2010.

On June 22, 2010, a representative of the Tribe removed Anderson & Wood, a QEP Contractor, from the Stagecoach Parcel, claiming that Anderson & Wood did not possess a valid tribal access permit, business permit, or right-of-way for their activity on the reservation. Later

that day, the Tribe sent a letter to QEP stating that the Tribe would deny QEP and its contractors access to the job site because QEP lacked a valid tribal permit. (Letter from Curtis Cesspooch, Chairman, Ute Tribal Business Committee, to Keith Rattie, CEO, QEP (June 22, 2010) attached as Ex. L to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) QEP's in-house counsel responded by informing the Tribe of its authorization to proceed with construction under the Agreement and volunteering to make its permits and authorizations available for inspection by the Tribe the following morning. (Email from Cris Castillo, Senior Counsel, QEP, to Tom Fredricks (June 22, 2010) attached as Ex. M to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) The next morning two Tribe members directed all workers involved with the Iron Horse Turnaround to leave the Stagecoach Parcel. (Aff. Matt Hacking attached as Ex. N to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) A Tribe member also confiscated the valid access permits presented by two QEP employees at the site of a power line built to service the expansion. (Matt Hacking, District Manager Operations, QEP, Testimony at Preliminary Injunction Hearing (Aug. 2, 2010).) The Tribe has informed QEP that a court order is required for re-entry.

Currently, the Tribe allows two people at a time to enter the Stagecoach Parcel to continue the operation of the Stagecoach Processing Plant, but the vehicle entrance to the parcel is padlocked. In order to obtain access for anyone other than the two employees who run the plant, QEP employees are required to contact Leallen Blackhair, the Ute Tribe Energy and Minerals Compliance Coordinator, who determines whether to allow access. The Tribe has denied access to the drinking water delivery truck and has failed to respond to other requests for access. One of the pumps necessary to process the natural gas has failed and the backup pump

has begun to leak. (Nathan Collins, Engineering Manager, QEP, Testimony at Preliminary Injunction Hearing (Aug. 2, 2010).) At the time the contractors were excluded, the exterior construction of the Iron Horse Expansion was 90 percent complete and the mechanical construction was 40 percent complete. (Ira Massey, Chief Construction Inspector, QEP, Testimony at Preliminary Injunction Hearing (Aug. 2, 2010).) The concrete had all been poured and the remaining construction inside the Stagecoach Parcel is a "matter of going up," i.e. building on a foundation that has already been laid. (Id.)

## **PROCEDURAL HISTORY**

Before the dispute over access to the Stagecoach Processing Plant, the Tribe had intervened as a plaintiff in an action instigated by the federal government concerning the environmental compliance of QEP's activities on tribal lands.[3] See United States v. Questar Gas Mgmt. Co., No. 2:08-cv-167 (D. Utah). On June 30, 2010, QEP brought a counterclaim and motion for temporary restraining order against the Tribe in that action, requesting that the Tribe be enjoined from denying QEP access to the Stagecoach Processing Plant and its expansion, the Iron Horse Turnaround, and related transmission line project sites.

The United States District Court of the District of Utah, Judge Dale A. Kimball presiding, issued a Memorandum Decision and Order Granting Preliminary Injunction, ordering that the Tribe was "restrained and enjoined, pending resolution of an arbitrator, from all activities which prevent [QEP]'s and its construction contractors' access to the Stagecoach Processing Plant, the Stagecoach Processing Plant expansion project known as Iron Horse, and the related transmission

---

[3] QEP argues that the Tribe has excluded it from the Stagecoach Parcel because QEP argued in the litigation before Judge Kimball that a portion of the Uintah-Ouray Reservation had been disestablished by legislative process.

6

line project sites." (Mem. Dec. and Order Granting Preliminary Injunction, 8-9, attached as Ex. M to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) The order further directed the Tribe "pending resolution by an arbitrator, to allow [QEP] and its construction contractors to resume surface access to the Stagecoach Processing Plant, the Stagecoach Processing Plant expansion project known as Iron Horse, and the related transmission line project sites. (Id. at 9.)

In spite of the order, the Tribe continued to interfere with QEP's access to the Stagecoach Parcel. On July 13, 2010, Judge Kimball issued an order to show cause why the Tribe should not be held in contempt for violating the preliminary injunction order. The Tribe responded by filing a motion to vacate the order granting a preliminary injunction on the grounds that the court lacked subject matter jurisdiction to enter that order. The court agreed with the Tribe and, on July 16, 2010, vacated the order granting QEP's motion for a preliminary injunction.

On July 19, 2010, the Tribe filed a motion for a temporary restraining order in Tribal Court to allow the Tribe to exclude QEP from the Stagecoach Parcel. QEP argued that the Tribal Court lacked jurisdiction. The Tribal Court rejected QEP's jurisdictional argument and issued an injunction barring QEP from continuing construction of the Iron Horse Turnaround. Instead of filing an appeal in the tribal system, QEP filed this action.

The parties have agreed to arbitrate the underlying breach of contract dispute.

## ANALYSIS

The court must first determine whether it has subject-matter jurisdiction, and, if it does, whether the Tribal Court had jurisdiction to enter its preliminary injunction.

## JURISDICTION

### The Federal Court's Subject Matter Jurisdiction

The court has subject matter jurisdiction because the Tribal Court issued a preliminary injunction–enjoining QEP from continuing its construction–and QEP presents a federal question regarding whether the Tribal Court had jurisdiction to issue that injunction. See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 852 (1985) ("The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331.").

### The Tribal Court's Jurisdiction

In general, tribal courts have limited jurisdiction over non-Indians.

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

Montana v. United States, 450 U.S. 544, 565-66 (1981).

And when a tribal court exercises jurisdiction, a federal district court should stay related proceedings in the district court to allow the jurisdiction question to be fully litigated in the tribal system before looking at the jurisdiction question itself.

> . . . Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the

> challenge. . . . Exhaustion of tribal court remedies, moreover, will
> encourage tribal courts to explain to the parties the precise basis for
> accepting jurisdiction, and will also provide other courts with the
> benefit of their expertise in such matters in the event of further
> judicial review.

Nat'l Farmers Union Ins. Cos., 471 U.S. at 856.

Although the court would generally stay its proceeding in deference to the tribal system until appellate review was complete, exhaustion is not required "where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." Id. at 856, n.21.

The court would stay its determination if the question of the Tribal Court's jurisdiction rested on an analysis of the jurisdictional bounds set forth in Montana.[4] But because there was a clear and unambiguous waiver of Tribal Court jurisdiction in the Agreement, the litigation in Tribal Court is patently violative of the parties' written agreement and exhaustion is unnecessary. In addition, because QEP needs immediate relief as described below and cannot seek money damages from the sovereign Tribe, exhaustion would deprive QEP of an adequate remedy.

Article 17 of the Agreement, entitled "Resolution of Disputes," describes the types of remedies that might be available following a breach of the Agreement and the process to resolve disputes related to the Agreement. Specifically, if disputes or claims are not settled amicably, "either Party may seek a resolution of the dispute by arbitration," in other words either party may elect arbitration over suit. (Agreement ¶ 17.2 (emphasis added), attached as Ex. A to QEP's

---

[4] "[The Tribal Court] believes that the facts of this case meet both of the Montana exceptions–1) the non-member's consensual relationship with the tribe, and 2) conduct which threatens or has direct effects on the political integrity, economic security, or health or welfare of the tribe or its members." Ute Indian Tribe v. Questar Gas Mgmt. Co., No. cv 10-337, mem. dec. and order at 4, n.1 (Ute Tribe July 23, 2010).

9

Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) Article 17 contemplates injunctive relief as one remedy that might be available to QEP: "[T]he Parties expressly agree that the only remedies available against the Tribe for the purposes of this Concession Agreement are for injunctive and declaratory relief . . . ." (Id.) "The Tribe expressly grants a limited waiver of Tribal sovereign immunity for the limited purpose of adjudicating any and all claims, disputes or causes of action arising out of or relating to this Concession Agreement[5] and consents to arbitration <u>and suit</u> solely for such limited purposes." (Id. (emphasis added).)

The Agreement further outlines which court shall be the proper forum to resolve disputes under the Agreement: "The parties agree that they shall have as a first recourse for the enforcement of this Article 17 to the United States District Court for the District of Utah and appellate courts therefrom." (Id. ¶ 17.5.) "The tribe makes its limited waiver of sovereign immunity for purposes of any action by [QEP] to enforce this Concession Agreement, and agrees to forego any right or claim or right to seek or require exhaustion of Tribal court remedies as a prerequisite to any action by [QEP] to enforce this Concession Agreement." (Id.) The Tribe also agreed under another provision that "[s]hould any conflict arise between Tribal laws and regulations and this Concession Agreement, Tribal laws and regulations shall not control over the specific provisions of this Concession Agreement." (Id. Art. 14.)

"Suits against Indian tribes are . . . barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." <u>Okla. Tax Comm'n v. Citizen Band of Potawatomi Tribe of Okla.</u>, 498 U.S. 505, 509 (1991). The Agreement constitutes a clear and unambiguous waiver

---

[5] Although the Tribe argues that the action in Tribal Court was for trespass and not breach of contract, it is clear to this court, as it was to the Tribal Court, which relied heavily on the language of the Agreement, that that action was at least "related to" the Agreement.

of sovereign immunity and tribal court jurisdiction, except where QEP seeks damages for breach of contract. On this point, the court respectfully disagrees with the Tribal Court, which said that "[a] fair reading of Article 17 demonstrates that the Tribe has made a limited waiver of immunity only for 1) federal or state courts to order participation in arbitration, and/or 2) for claims to be adjudicated through arbitration." Ute Indian Tribe v. Questar Gas Mgmt. Co., No. cv 10-337, mem. dec. and order at 5 (Ute Tribe July 23, 2010). Article 17 contemplated the possibilities not only of arbitration but also of suit in a court of law, dictated that QEP could seek injunctive relief, and determined where disputes would be settled.

Because the court has jurisdiction and has determined that the Tribal Court's preliminary injunction is not valid because it was entered without jurisdiction, the court turns to whether QEP has met its burden to obtain a preliminary injunction.

## QEP'S REQUEST FOR A PRELIMINARY INJUNCTION

### Standard for Preliminary Injunction

A preliminary injunction is an extraordinary remedy. Preliminary injunctive relief is only appropriate if the moving party establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208 (10th Cir. 2009). Certain types of injunctions are disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). When the court

rules on a disfavored injunction, the preliminary injunction factors "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." Id. When considering whether an injunction alters the status quo, the court does not look to "the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" Id. at 1013 (McConnell, J. concurring) (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)).

The Tribe argues that QEP seeks a mandatory preliminary injunction because the status quo is the situation that existed before QEP's commencement of construction activities. But the dispute between the parties in this case did not begin with the commencement of construction activities, but rather after QEP raised its affirmative defense regarding the disestablishment of part of the reservation in the case before Judge Kimball. During the last peaceable uncontested status, QEP was constructing the Iron Horse Turnaround with full access to the Stagecoach Parcel. Indeed, QEP has nearly completed the construction of the Iron Horse Turnaround. Accordingly, the preliminary injunction QEP requests is not disfavored because it would maintain the status quo.

### **Likelihood of Success on the Merits**

QEP is likely to succeed on its breach of contract claim because the Agreement likely governs the dispute and the Tribe has likely breached the Agreement. The Tribe argues that this dispute is not governed by the provisions of the Agreement, and therefore it was within its sovereign rights to expel QEP's workers. This argument, however, is belied by the language in the Agreement, which was approved by the Tribe and by the United States. Whether QEP

12

provided adequate notice of its proposed construction activities and obtained proper approval fits squarely within the provisions of the Agreement. Letters from the Tribe to QEP further support the finding that both parties realized that their disputes were governed by the Agreement.

The Tribe argues that the dispute involves health and safety concerns which it must address as a sovereign nation, rather than pursuant to a contractual agreement. The Agreement, however, contemplates the Tribe's role in safeguarding the health and safety concerns within its lands. The approval provisions specifically provide a basis for the Tribe to object to future work on those grounds. Therefore, even though the concerns relate to the Tribe's sovereign role, a resolution of those concerns do not take the matter outside of the context of the Agreement. Whether an additional environmental assessment was needed for each of the projects is also a matter governed by the Agreement and will be determined by the arbitrator. Moreover, the Tribe agreed that the terms of the Agreement control over tribal law should any conflict arise. The court concludes, therefore, that QEP is likely to succeed on the merits of its claim that the Agreement governs this dispute rather than tribal law.

QEP is also likely to succeed on its claim that the Tribe breached the Agreement. QEP has put forth evidence that it complied with the notice provisions of the Agreement when constructing and expanding its facility on the Stagecoach Parcel. The Tribe has presented no evidence that it objected to the plans QEP submitted as required by the Agreement. Further, the Agreement gives the Tribe no basis for shutting down operations and expelling workers if a dispute arises under the Agreement. Rather, the Agreement provides for disputes to be resolved either through arbitration or through a Utah federal or state court action.

**Irreparable Harm to Movant**

QEP has demonstrated that it will suffer irreparable harm if the court does not issue the preliminary injunction. "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction . . . ." Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1259 (10th Cir. 2004). The moving party demonstrates irreparable harm by showing "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." RoDa Drilling Co. v. Siegal, 552 F.3d at 1210. "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." Chamber of Commerce of the U.S. v. Edmondson, 594 F.3d 742, 770-71 (10th Cir. 2010). In addition, "when interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest." RoDa Drilling Co., 552 F.3d at 1210. In RoDa Drilling, the court held that the failure to convey the property title to the plaintiff combined with the speculative nature of any potential damages created irreparable harm. Id.

QEP has demonstrated that it likely has a property interest in the Stagecoach parcel under the Agreement. Because of the unique nature of a property interest, QEP will suffer irreparable harm absent injunctive relief. Further, QEP may not recover money damages under the Agreement for any harm suffered. Section 17.2 of the Agreement specifies that "[t]he Tribe does not waive its immunity from money damages." (Agreement ¶ 17.2, attached as Ex. A to QEP's Mem. Supp. Mot. Temp. Rest. Order and Prelim. Inj.) Thus, QEP has no adequate remedy at law for the Tribe's shutdown of its construction sites and has demonstrated irreparable harm.

### Balance of Equities

To grant a preliminary injunction, the balance of equities must tip in the movant's favor. RoDa Drilling Co., 552 F.3d at 1208. In considering the balance of equities, the Tribe argues that the court should consider the environmental harms that may be occurring as a result of the construction work. The Tribe points to a June 30, 2010, inspection that reveals that the Stagecoach facility has the potential to exceed emissions thresholds established by the Clean Air Act. But the expansion to the Stagecoach facility will not be operational until the arbitrator has made a final decision. The Tribe also argues that the construction project itself will affect tribal property. QEP argues that the Tribe will not be harmed if the court requires them to allow construction activities to continue because the harms alleged by the Tribe rely on future harms that will be suffered when the expansion project begins operation, not harm from the construction project itself.

At the hearing on this motion it became apparent that the Iron Horse Turnaround is nearly complete, and under this order construction will be confined to the Stagecoach Parcel. As a result, continuing with construction will not harm the Tribe significantly. And any environmental impact to tribal lands from the operation of the Iron Horse Turnaround may be addressed in arbitration or in this or future litigation. Because the potential environmental harms here are not caused by the construction project itself, but by future operation of the facility, the harm caused by the construction does not weigh heavily in favor of the Tribe. Rather, QEP has demonstrated that the balance of harms tips in its favor.

### Public Interest

The Tribe argues that an injunction would be adverse to the public interest because it

would impinge on the Tribe's sovereignty. See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 856 (1985) ("Congress is committed to a policy of supporting tribal self-government and self-determination."). It further argues that the environmental impact of the plant that QEP is constructing will adversely affect the public interest, but the plant will not be operational until after the arbitrator makes a final decision.

QEP argues that padlocking the only vehicle entrance to the Stagecoach Parcel presents a safety risk both to the employees working at the Stagecoach Processing Plant and to the public. QEP also argues that over 100 construction workers may lose their jobs if QEP is not able to continue construction. Finally, QEP argues that its customers, entities that provide natural gas to individuals in Colorado and Utah, may have to obtain natural gas elsewhere if the Tribe prevents required maintenance to the Stagecoach Processing Plant.

The Tribe has specifically waived sovereignty concerning the adjudication of disputes under the Agreement, so preserving the Tribe's sovereignty is not a significant factor in this instance. (Agreement ¶ 17.2.) On the other hand, the public has a great interest in maintaining the Stagecoach Processing Plant in a way that prevents injury to the people and environment around the facility. Preventing QEP from maintaining their facility has a much greater risk to the environment than continued construction of the Iron Horse Turnaround. Further, the public has a strong interest in obtaining natural gas and in maintaining the jobs provided by the construction project. Therefore, the public interest weighs in favor of issuing a preliminary injunction.

**ORDER**

This court has subject matter jurisdiction and determines that because the Tribal Court entered its preliminary injunction without jurisdiction, that preliminary injunction is not valid.

The court has supplemental jurisdiction over QEP's breach of contract claim and enters a preliminary injunction <u>to remain in effect pending resolution by an arbitrator</u>. QEP shall post a $10,000 bond with the Clerk of Court.

**<u>PRELIMINARY INJUNCTION</u>**

Based on the above, the court enters the following Preliminary Injunction:

The Ute Indian Tribe of the Uintah and Ouray Reservation is:

(a) ORDERED, pending resolution by an arbitrator, to remove the padlock from the gate of the Stagecoach Parcel and to allow QEP and its construction contractors to resume surface access to the Stagecoach Parcel;

(b) ENJOINED AND RESTRAINED, pending resolution by an arbitrator, from all activities which prevent QEP's and its construction contractors' access to the Stagecoach Parcel; and

(c) ORDERED, pending resolution by an arbitrator, to provide permits to all QEP employees, QEP construction contractors, and those providing services to QEP within three hours of their submission of an application, or else to provide within three hours of their submission of an application a good faith basis for denying a permit. Failure to respond within three hours will be considered equivalent to granting a permit. Denying a permit in bad faith is a violation of this order and will be grounds for the court to find the Tribe in contempt.

SO ORDERED this 4th day of August, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge